IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEPHEN S. WALKER and GLORIA S.
WALKER,

                Plaintiffs,                CV-07-1829-ST

     v.                                        FINDINGS AND
                                                    RECOMMENDATION

METROPOLITAN LIFE INSURANCE
COMPANY, a New York corporation, and NEW
ENGLAND MUTUAL LIFE INSURANCE
COMPANY, doing business as NEW ENGLAND
FINANCIAL, a Massachusetts corporation,

                Defendants.

STEWART, Magistrate Judge:

      Plaintiffs, Stephen S. Walker and Gloria S. Walker ("the Walkers"), originally filed this action in Multnomah County Circuit Court against defendants, New England Mutual Life Insurance Company, doing business as New England Financial ("New England Financial") and Metropolitan Life Insurance Company ("MetLife"). The Complaint alleges that the Walkers

1 - FINDINGS AND RECOMMENDATION

purchased a life insurance policy on September 1, 1993, from New England Financial.[1] The Walkers complain that when they purchased the policy, they believed that the annual premium would remain at $1,900.00 per year. However, now defendants seek to charge the Walkers a higher annual premium. As a result, the Walkers allege four claims against defendants for: (1) declaratory relief that the annual premium for the policy is $1,900.00 per year (First Claim); (2) breach of contract (Second Claim); (3) fraud (Third Claim); and (4) unconscionability (Fourth Claim).

On December 12, 2007, defendants filed a Notice of Removal to this court alleging jurisdiction based on diversity of citizenship under 28 USC § 1332. Defendants allege that the Walkers are citizens of the State of Oregon. Notice of Removal, ¶ 6. MetLife is a New York corporation with its principal place of business in New York. *Id*, ¶ 7. New England Financial is a Massachusetts corporation with its principal place of business in Massachusetts. *Id*, ¶ 8. Both defendants are subsidiaries of Met Life, Inc. Corporate Disclosure Statement of Metropolitan Life Insurance Company (docket #4), p. 1; Corporate Disclosure Statement of New England Life Insurance Company Doing Business As New England Financial (docket #5), p. 1. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

Defendants have filed a Motion to Dismiss Under FRCP 12(b)(6) (docket #6) directed at each of the Walkers' four claims. For the reasons set forth below, this court recommends that the motion should be granted with leave to amend the Third Claim alleging fraud.

---

[1] Subsequent to the purchase of the insurance policy from New England Financial by the Walkers, New England Financial merged with MetLife. Pursuant to the terms of an endorsement to the policy purchased by the Walkers, MetLife assumed all duties, liabilities, and responsibilities under the policy. Policy Number 1U050420, Endorsement of August 30, 1996 (copy attached to Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss Under Rules 12(b)(6) and 9(b) (docket #9)).

**FINDINGS**

I. **Allegations in the Complaint**

In considering a motion to dismiss, the court must accept the allegations of the complaint as true. *Hishon v. King & Spalding*, 467 US 69, 73 (1984). In addition to reviewing the allegations in the complaint, the court also may consider documents referenced by, but not physically attached to, the complaint if the documents' authenticity is not questioned, and matters of which the court may take judicial notice. *Swartz v. KPMG LLP*, 476 F3d 756, 763 (9th Cir 2007); *In re Stac Elecs. Sec. Litig.*, 89 F3d 1399, 1405 n4 (9th Cir 1996), *cert denied*, 520 US 1103 (1997).

The Walkers allege that on September 1, 1993, they purchased a universal life insurance policy titled "Flexible Premium Adjustable Joint Life Policy" number 1U050420 ("Policy") from New England Financial which promised $75,000 in death benefits for Mr. Walker, $50,000 basic coverage under an Adjustable Joint Life First Provider plus an additional $25,000 term rider, and $50,000 in death benefits for Mrs. Walker. Complaint, ¶ 3. For the past 14 years, defendants have charged, and the Walkers have paid, the Planned Annual Premium of $1,900.00. *Id*, ¶ 5. Now that the Walkers have reached the ages of 75 and 74 and are retired, defendants intend to charge them an annual premium "determined by Section 2 guaranteed monthly insurance rates and amounts starting at $6,000 per year with annual increases according to the premium rates stated in Section 2" of the Policy. *Id*, ¶ 6. Based on the terms of the Policy and a representation made to them to induce them to purchase the Policy, the Walkers believed that the annual premium would remain at $1,900.00 until defendants paid the death benefits owed under the Policy. *Id*, ¶¶ 7, 14.

Three of the Walkers' claims arise out of the terms of the Policy. The First Claim seeks a declaration that the Planned Annual Premium is the annual premium and must remain at $1,900.00 per year through the life of the Policy. The Second Claim alleges a breach of the Policy by failing to charge the Planned Annual Premium as the annual premium on the Policy. The Fourth Claim seeks to declare unconscionable defendants' enforcement of any premium amount other than the Planned Annual Premium of $1,900.00.

In addition to these three claims, the Walkers also allege a Third Claim for fraud based on defendants' representation that the premium on the Policy would remain at $1,900.00 per year until defendants paid the death benefits. *Id*, ¶ 14. They further allege that defendants made this representation intending to induce them to purchase the Policy, take premiums from them until they could no longer afford to purchase alternative life insurance benefits, and then to increase the premium to such a level that they could not afford to keep the Policy in place. *Id*, ¶¶ 15-16.

## II. Declaratory Relief (First Claim)

The First Claim seeks a declaration that the annual premium on the Policy is $1,900.00 for each year the Policy is in force. Oregon's Uniform Declaratory Judgment Act, ORS Chapter 28, authorizes courts "within their respective jurisdictions . . . to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." ORS 28.010. The statute specifically allows determination of "any question of construction or validity" arising under written contracts, either before or after there has been a breach of the contract. ORS 28.020-.030. In essence, the Walkers argue that the "Planned Annual Premium" of $1,900.00 specified in the Policy is and should remain the amount of the annual premium so long as the Policy is in effect. Defendants respond that the Policy guarantees no specific annual premium. Instead,

pointing to the title and other provisions of the Policy, they argue that the annual premium changes depending upon the cost of insurance (which increases as the insured ages) and the prevailing interest rate.

The interpretation of an insurance policy is a question of law. *Hoffman Constr. Co. v. Fred S. James & Co. of Oregon*, 313 Or 464, 469, 836 P2d 703, 706 (1992). The policy "must be viewed by its four corners and considered as a whole." *Denton v. Int'l Health & Life Ins. Co.*, 270 Or 444, 449-50, 528 P2d 546, 549 (1974). The goal in interpreting a policy is to determine the intent of the parties. *Totten v. New York Life Ins. Co.,* 298 Or 765, 770, 696 P2d 1082, 1086 (1985). Intent is determined by looking to the terms and conditions of the policy. ORS 742.016; *Hoffman,* 313 Or at 469, 836 P2d at 706.

The terms are presumed to have been incorporated and used in their primary and general meaning. ORS 42.250. If an insurance policy explicitly defines the phrase in question, then the court must apply that definition. *Holloway v. Republic Indem. Co. of America*, 341 Or 642, 650, 147 P3d 329, 333 (2006) (citation omitted). Otherwise, the court must "first consider whether the phrase in question has a plain meaning, *i.e*., whether it 'is susceptible to only one plausible interpretation.'" *Id* (citation omitted). If so, then that meaning applies. *Id*. If the phrase in question has more than one plausible interpretation, then it is examined "in light of 'the particular context in which that [phrase] is used in the policy and the broader context of the policy as a whole.'" *Id*, quoting *Hoffman*, 313 Or at 470, 836 P2d at 706. However, "a term is ambiguous . . . only if two or more plausible interpretations of that term withstand scrutiny, *i.e.*, continue[ ] to be reasonable." *Hoffman*, 313 Or at 470, 836 P2d at 706. "If the ambiguity remains after the court has engaged in those analytical exercises, then 'any reasonable doubt as

to the intended meaning of such [a] term[ ] will be resolved against the insurance company. . .'"
*Holloway,* 341 Or at 650, 147 P3d at 334.

Hence, this court must look within the four corners of the Policy and consider the Policy as a whole. The Walkers' interpretation of the Policy is based on excerpts read in isolation and ignores other Policy terms and definitions. After examining the Policy as a whole, this court agrees with defendants' interpretation.

The Policy is not a term life insurance policy or a fixed premium policy. Instead, its terms allow the insurer to demand more money or increased premiums under the circumstances present here. First, the Policy expressly states that its premiums are not fixed. The cover page is titled in bold: "Flexible Premium Adjustable Joint Life Policy." That page also contains six bulleted paragraphs, one of which reads: "The amount and frequency of premium payments can be changed." A reading of the entire Policy makes it abundantly clear that the premium may change over time to keep the Policy in force depending on the cost of insurance, which increases as one ages, and the prevailing interest rate, which may change over time.

The Policy contains a "Policy Schedule" which, among other terms, states in bold capital letters: "THIS POLICY IS ADJUSTABLE. IF IT IS ADJUSTED, A NEW POLICY SCHEDULE WILL SUPERSEDE THIS SCHEDULE." Under the "Schedule of Premiums" on that same page, the "Planned Annual Premium" is stated as "$1,900.00." The Walkers rely primarily on that one provision. However, other provisions and definitions reveal that the Policy has no fixed premium.

Sections 5 ("Premiums") and 6 ("Monthly Deduction") of the Policy provide how the Planned Annual Premium is set at a level such that the combination of premium payments plus

6 - FINDINGS AND RECOMMENDATION

interest will be sufficient to keep the Policy in force. Each month a "Monthly Deduction" is deducted from the "Cash Value of this Policy." Policy, Section 6. The "Cash Value" is defined by Section 9 as the amount of net premium paid plus dividends (defined by Section 8 as "the divisible surplus of the Company") less the Monthly Deduction and any partial surrender (all with interest added). The "Monthly Deduction" is defined in Section 6 as follows:

> • The cost of insurance and the cost of any riders for the policy month;
> PLUS
> • An amount not greater than the Maximum Monthly Expense Charge shown in Section 1;
> PLUS
> • Any Monthly Administrative Charge shown in Section 1

Policy, Section 6.

The Policy further defines the "Cost of Insurance" as the "Death Benefit (on the first day of the policy month times .9967369426 minus the Cash Value (before the Monthly Deduction) on the first day of the policy month; TIMES the cost of insurance rate for that month." *Id.* On the same page, the Policy also defines the "Cost of Insurance Rates" as follows:

> The cost of insurance rates for each policy year for the initial Face Amount and for each increase in Face Amount are based on: the sex of each insured; the underwriting class of each insured; and the age of each insured on the first day of the policy year. *The rates will be set by the Company each year on the policy anniversary, based on the expectations of the Company as to future experience. The rates are guaranteed for one year.* The cost of insurance rates for the Policy will never be more than the rates shown in the Table of Guaranteed Monthly Insurance Rates. (See Section 2.)

*Id* (emphasis added).

As Section 2 indicates, the Cost of Insurance climbs dramatically as the insureds age (from $2.8011 per $1,000 of coverage in year 1 to $8.6820 per $1,000 of coverage in year 14).

7 - FINDINGS AND RECOMMENDATION

As a result, the Monthly Deduction is expected to and does increase each year.

In addition, the Policy demonstrates how it will lapse if the Planned Annual Premium is not adjusted. Section 5 of the Policy states that the "Statement of Cost and Benefit Information shows the year, if any, that this Policy will lapse even if all planned premiums have been paid." As set forth in the two page attached "Statement of Cost and Benefit Information,"[2] the Planned Annual Premium was calculated such that the combination of premium payments and interest earned on the Cash Value would be sufficient to make the projected Monthly Deductions for three years.

Above a chart listing the Planned Annual Premiums of $1,900.00, the Statement of Cost and Benefit Information states in all capital letters: "ACTUAL AMOUNTS [of the Planned Annual Premiums] MAY DIFFER FROM THOSE SHOWN DUE TO CHANGES IN: CURRENT INTEREST RATE, COST OF INSURANCE RATE, FACE AMOUNT, TIMING OR AMOUNT OF PREMIUMS, OR DEATH BENEFIT OPTION." Hence, premium levels are tied to the current interest rate which may fluctuate. The current interest rate is presented on page 2 of the Statement of Cost and Benefit Information as 7.25%. However, the Policy also has clear, conspicuous language stating that interest rates can change. The Policy notes that "the minimum guaranteed interest rate is 4%." Policy, Section 1. It also states that "[a] rate higher than 4% can be used . . . [t]he rate to be used will be set by the Company each calendar month in advance." Policy, Section 9. And as Section 6 warns, "[t]he [cost of insurance] rates will be set by the Company each year on the Policy anniversary . . . [and] [t]he rates are guaranteed for one year."

---

[2] The Statement of Cost and Benefit Information is attached as Exhibit B to Defendants' Memorandum (docket #7).

The Statement of Cost and Benefit Information also contains other tables which demonstrate that the Planned Annual Premiums can change. Table 1 shows how "BASED ON POLICY GUARANTEES, THIS POLICY WILL TERMINATE IN YEAR 3 UNLESS ADDITIONAL PREMIUM IS PAID." That table is calculated on the "Guaranteed Basis," which is defined as the "guaranteed insurance rates and an interest rate of 4%," and illustrates that the Policy will lapse in year three when the cash value drops to zero. Table 2 is calculated on the "Current Basis," which is defined as the "current insurance rates and an interest rate of 7.25%" and shows a cash value remaining in year 10.

Accordingly, the Policy's cash value and Monthly Deduction must be calculated taking into consideration the interest rate on a given date. That rate necessarily fluctuates as market conditions change. Based on the change in interest rate, the Policy's cash value may no longer cover its monthly charge. In that event, the insurer could request additional money to increase the Policy's cash value, ensuring that the cash value exceeds the Monthly Deduction. If interest rates drop, then the insureds must pay a higher premium to keep the policy in force beyond year 3. Given the title of this Policy as a "Flexible Premium Adjustable Joint Life Policy," this is the only reasonable Policy interpretation. It also is consistent with the common industry definition of flexible premium adjustable life insurance, also known as universal life insurance.[3]

As expressly warned on the second page of the Policy, "coverage may expire prior to the Maturity Date [of September 1, 2032] if premiums paid are insufficient to continue coverage to

---

[3] "Universal Life Insurance **is like buying a mobile home in a mobile home park (but may be of much better or worse quality than a mobile home is thought to be).** With such a mobile home, you buy the home at a fixed cost, but rent the land underneath; which means, as time goes by, you build equity but you can still have a rent increase on the space beneath. Similarly, *universal life insurance* usually has an element of equity build-up (cash value) but does not have guaranteed forever fixed internal policy costs and those costs may vary or increase over time." *See* http://www.pgafinancial.com/life.html (emphasis in original) (last visited Feb. 8, 2008).

9 - FINDINGS AND RECOMMENDATION

that Date." Furthermore, the "Grace Period" in Section 6 contemplates that the Net Cash Value may not be enough to cover the Monthly Deduction for some month(s). If so, a premium notice will be mailed to the insureds which they must pay within a 62 day grace period or the "Policy will lapse without value." Rather than presenting only a vague possibility of a change in premium payments, as argued by the Walkers, the Policy provisions clearly anticipate that the Planned Annual Premium might change and specify the method for calculating that change.

The Walkers appear to argue that the term "Planned Annual Premium" is ambiguous. However, the term "planned" is used on the same page as "guaranteed" and those terms clearly have different meanings. They also argue that the Policy "with its tedious prolixity" is vague, abstruse, and obscure and appears to give a fixed premium at the beginning which it takes away six pages later. Admittedly, a lay person reading the Policy could easily be confused by its meaning because it is difficult to understand. However, examining the Policy as a whole and applying the plain and defined meaning of its terms as required under Oregon law, the Policy has a definite legal meaning or interpretation and, thus, can be construed as a matter of law. Because it is not subject to two differing and reasonable interpretations, it is not ambiguous.

The Walkers complain that now when they are in their mid-70s and on a limited income, defendants are raising the premium charge to a level that they cannot afford to pay in order to force them from realizing the life insurance benefits. However, neither the Walkers nor defendants could foresee the financial circumstances of the current market 14 years ago. Furthermore, during the past 14 years the Policy has benefitted the Walkers by providing them with life insurance coverage carrying a cash value.

10 - FINDINGS AND RECOMMENDATION

As a result, the Walkers fail to state a claim for declaratory relief and the First Claim should be dismissed with prejudice.

### III. Breach of Contract (Second Claim)

The Second Claim for breach of contract is based on the premise that the Planned Annual Premium is fixed at $1,900.00 for the life of the Policy. As a result, the Walkers seek damages in the sum of $6,564.89, representing the amount they were overcharged from 2002 through 2007 for the "cost of keeping the insurance." As discussed above, Oregon law does not permit the Walkers to circumvent the four corners of the Policy and its plain language. For the same reason that the Walkers fail to state a claim for declaratory relief, they also fail to state a claim for breach of contract. As a result, the Second Claim should be dismissed.

### IV. Fraud (Third Claim)

The Fourth Claim alleges that "defendants represented to the Walkers that the premium on the policy would remain at $1,900.00 per year until the defendants paid the death benefits owed to the Walkers under the policy." Complaint, ¶ 14. It further alleges that defendants had no present intention to perform that promise or to pay out any death benefits. *Id*, ¶ 15. Instead, defendants intended to accept premium payments until the Walkers could no longer afford to obtain alternative life insurance benefits and then increase the premium to such a level that they could no longer afford to keep the Policy in force. *Id*, ¶ 16. As a result, the Walkers allege that they will lose the life insurance benefits under the Policy in the sum of $125,000. *Id*, ¶ 17.

///

///

///

11 - FINDINGS AND RECOMMENDATION

In Oregon, a fraud claim consists of the following elements:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) [the speaker's] intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) [the hearer's] reliance on its truth; (8) [the hearer's] right to rely thereon; and (9) [the hearer's] consequent and proximate injury.

*Conzelmann v. Nw. Poultry & Dairy Prods. Co.*, 190 Or 332, 350, 225 P2d 757, 764 (1950) (citations omitted).

A fraud claim may be premised upon a "promise made with the knowledge that it will not be performed or with reckless disregard that it will not be performed." *Estate of Schwarz v. Phillip Morris Inc.*, 206 Or App 20, 39, 135 P3d 409, 422 (2006) (citation omitted). However, in alleging a fraud claim, the plaintiff "must state with particularity the circumstances constituting fraud or mistake." FRCP 9(b). "The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Neubronner v. Milken*, 6 F3d 666, 671 (9th Cir 1993) (citations omitted). Where there are multiple defendants, "[t]he plaintiff must allege the identity of the person making the false representation." *Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 749 F Supp 1042, 1047 (D Or 1990).

Defendants assert that the Walkers' fraud allegations are insufficient because they do not identify who made the alleged representations and where and when the representations were made. The Walkers allege that they purchased the Policy from New England Financial. Complaint, ¶ 3. However, the pleadings contain no further allegations to support a fraud claim against New England Financial or Met Life which has assumed New England Financial's obligations. In particular, the Walkers do not identify which agent(s) of New England Financial

12 - FINDINGS AND RECOMMENDATION

made the alleged representations, nor the time or place of any such representations. The current allegations are woefully inadequate under the particularity standard of FRCP 9(b).

Although the Walkers should be provided an opportunity to cure these deficiencies, they may face a statute of limitations problem. In Oregon, a fraud claim accrues two years from the discovery of the fraud. ORS 12.110(1). According to paragraph 11 of the Complaint, defendants have overcharged the Walkers for the "the cost of keeping the insurance" since 2002. If the Walkers were indeed aware of the amount and reason for the overcharge in 2002, then their fraud claim may be barred as untimely. However, the Complaint also alleges in paragraph 5 that defendants charged, and the Walkers paid, the Planned Annual Premium of $1,900.00 for 14 years, which would be through 2007. If so, then a fraud claim may still be timely. This court cannot determine the timeliness of the Walkers' fraudulent inducement claim based on the current pleadings.

## V. **Unconscionability (Fourth Claim)**

The Fourth Claim alleges that the Policy is a contract of adhesion and that any provision increasing the Planned Annual Premium above $1,900.00 per year is unconscionable and void. Complaint, ¶¶ 20-22. Unconscionability is normally a doctrine asserted as an affirmative defense that was not originally intended as a basis for damage recovery. *W.L. May Co., Inc. v. Philco-Ford Corp.*, 273 Or 701, 707, 543 P2d 283, 286 (1975). In response the Walkers argue that they are requesting declaratory relief from defendants' unconscionable enforcement of a "latent ambiguity" in the Policy, consisting of the term(s) setting a flexible premium. As a result, the Fourth Claim seeks relief against defendants' enforcement of that latency.

If the Walkers seek no more than declaratory relief in the Fourth Claim, then the Fourth Claim is entirely subsumed by their First Claim.  However, as discussed above, the Policy is not ambiguous and the First Claim fails to state a claim.  For that same reason, the Fourth Claim should be dismissed.

## RECOMMENDATION

For the reasons stated above, defendants' Motion to Dismiss Under FRCP 12(b)(6) (docket #6) should be GRANTED with leave to replead the Third Claim alleging fraud.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due **March 3, 2008**.  If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.  If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 14th day of February, 2008.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

14 - FINDINGS AND RECOMMENDATION